BOGGS, Justice, concurring.
I join the Court's opinion in full, but write to clarify certain implications of the Court's decision today and our earlier decision in Olevik v. State, 302 Ga. 228, 806 S.E.2d 505 (2017).
First, it is important to identify the provisions of the implied consent law that are not affected. As acknowledged both in the Court's opinion today and in Olevik, the scope of these decisions is limited to chemical tests of a driver's breath; they do not apply to tests of a driver's blood. Also unaffected is the core component of the implied consent enforcement scheme: the administrative license suspension provided by OCGA § 40-5-67.1 (c) and (d). Additionally, the holding that a driver's refusal to take a breath test may not be used in a criminal proceeding does not forbid its use in an administrative proceeding concerning suspension of a driver's license, and that core function of the implied consent law remains in force, notwithstanding the Court's opinions today and in Olevik.
That being said, these decisions affect significant portions of the implied consent law. The statements in the implied consent notices set forth in OCGA § 40-5-67.1 (b) - that Georgia law "requires" the driver to submit to breath testing; that the "refusal to submit ... may be offered into evidence" against the driver at trial; and that the driver's license "may be suspended" (as opposed to "shall") if the driver submits and the results indicate an alcohol concentration above a prohibited level - are likely to become problematic in future cases as a result of Olevik or the *297 Court's decision today.[1] And it is conceivable that these decisions could affect the admission of previous DUI convictions pursuant to OCGA § 24-4-417 (a) (1). Moreover, officers are required to read the warnings in a "substantively accurate" form. Sauls v. State, 293 Ga. 165, 167-168, 744 S.E.2d 735 (2013), overruled in part on other grounds, Olevik, 302 Ga. at 246 (2) n.11 (c) (iv), 806 S.E.2d 505 ; see OCGA § 40-5-67.1 (b) ("Such notice shall be read in its entirety but need not be read exactly so long as the substance of the notice remains unchanged.") But only the General Assembly can **225 change what they are required to read. Thus, the General Assembly may wish to revise the provisions of the implied consent law, particularly the content of the implied consent notice.
It is also worth noting that the General Assembly and the people could reconsider Paragraph XVI itself. The Court's opinions here and in Olevik discuss at length Paragraph XVI's application to incriminating acts of a defendant. This understanding of Paragraph XVI has become something of an outlier in state and federal constitutional interpretations of self-incrimination, but, as this Court observed in Olevik and demonstrates more fully today, it has a long history stretching back over more than a century of case law and through several Georgia constitutions. And, of course, the amendment of a constitutional provision, particularly one of such long standing that has generated a substantial body of case law, should not be undertaken lightly. Moreover, the potential effects of such an amendment upon other areas of law should also be borne in mind. However, because the Court's decision today is rooted in a constitutional provision that was adopted by the legislature and the people, if the General Assembly and the people of Georgia see fit to take our self-incrimination law in a different direction, a clear understanding of the scope and impact of our decision here today may aid in informing their decision.
I am authorized to state that Justice Blackwell and Justice Bethel join in this concurrence.

In Olevik, we rejected the appellant's facial challenges to the implied consent notice as well as his particular as-applied challenge. But in doing so, we noted that he had pointed out "deficiencies in the implied consent notice," and further observed, "The General Assembly may wish to amend the implied consent notice statute; if it does, among the changes it may consider would be a clearer explication of the right to refuse testing, and a more accurate articulation of the likelihood of license suspension." 302 Ga. at 250 and n.14, 806 S.E.2d 505.