**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 1, 2019**

# In the Court of Appeals of Georgia

A17A1218. THE STATE v. COUNCIL.

REESE, Judge.

This is the second appearance of this case before this Court. On October 30, 2017, we reversed the trial court's grant of the motion in limine filed by Susan Council ("the Appellee") to suppress the results of a breath test obtained after her arrest for driving under the influence ("DUI").[1] On May 21, 2018, the Supreme Court of Georgia granted the petition for a writ of certiorari filed by the Appellee and vacated our opinion stating "the case is remanded to the Court of Appeals for reconsideration by that Court in light of Division 1 of *Caffee v. State*[.[2]]" Thus, *Caffee*

---

[1] *State v. Council*, 343 Ga. App. 583 (807 SE2d 504) (2017).

[2] 303 Ga. 557 (814 SE2d 386) (2018); see Supreme Court Order, Case No. S18C0494, dated May 21, 2018.

pertains only to the facts in our analysis as to whether the Appellee voluntarily consented to the state-administered breath test. For the reasons set forth infra, we again reverse the trial court's grant of the Appellee's motion in limine to suppress the results of her breath test.

> When reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. An appellate court also generally must limit its consideration of the disputed facts to those expressly found by the trial court.[3]

The Supreme Court of Georgia has made it clear that, upon review,

> appellate courts must focus on the facts found by the trial court *in its order*, as the trial court sits as the trier of fact. An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape.[4]

So viewed, the evidence presented at the suppression hearing, including the audio and video dashcam recordings from the patrol cars of responding police

---

[3] *Caffee*, 303 Ga. at 557 (citations and punctuation omitted).

[4] Id. at 559 (1) (citations and punctuation omitted; emphasis in original).

officers, showed the following indisputable facts.[5] On the evening of September 15, 2016, a multi-vehicle collision occurred involving the Appellee. A Cobb County police officer ("police officer") responded to the scene and spoke briefly with the Appellee. The Appellee refused medical treatment for her injuries, which included a bloody nose and lacerations on her hands. She expressed concern to the police officer, however, about the need to pick up her daughter from soccer practice.

Although the police officer did not smell any odor of alcohol coming from the Appellee, other first responders at the scene told him that she smelled of alcohol. The police officer requested that a DUI Task Force Officer ("DUI officer") come to the scene.

The police officer's dashcam recording shows that from the time of the collision until the DUI officer arrived on the scene, the Appellee had possession of her phone, and she walked around the accident scene and talked on her phone while she waited.

When the DUI officer arrived at the scene, he briefly spoke with the police officer. Next, the DUI officer escorted the Appellee from her car to the front of his

---

[5] The Appellee did not testify at the suppression hearing.

patrol car where he observed a strong odor of alcohol coming from the Appellee, that her eyes were bloodshot and watery,[6] and she had "communication issues."

The DUI officer's dashcam recording showed that while walking to the DUI officer's patrol car, the Appellee's phone rang, and the DUI officer allowed her to answer it. After finishing the phone call, the Appellee handed her phone to the DUI officer, who placed it in the Appellee's purse before putting the purse on the hood of the patrol car. The DUI officer asked the Appellee if she had been drinking, and she admitted that she had consumed two glasses of wine at a birthday party that evening and gave no explanation for her failure to apply her brakes when she saw traffic stopping ahead.

During the DUI investigation, the Appellee's boyfriend arrived at the accident scene. He told the police officer that the Appellee had called him to pick her up, but the officer refused to allow him to talk to the Appellee at that time because the area was an accident scene and the Appellee was being evaluated for DUI.

At the DUI officer's request, the Appellee blew into a portable Intoxilyzer, which showed a positive response for alcohol. The Appellee initially agreed to

---

[6] During cross-examination, the DUI officer admitted that the Appellee's red and watery eyes could have been attributable to her being hit in the face by her car's airbag during the collision.

4

participate in the Horizontal Gaze Nystagmus ("HGN") test, but then declined to perform the remaining evaluations after the DUI officer reminded her that those tests were voluntary evaluations to determine if she was safe to drive. She stated that she did not know her rights and said that she wished she could call "somebody" to come get her. The Appellee also spontaneously admitted to the DUI officer that she was afraid she would fail the tests and that she "might" be under the influence. The DUI officer's dashcam recording showed that while the Appellee asked numerous questions about the field sobriety tests and asked that others not watch her perform the evaluations, throughout his interaction with the Appellee, the DUI officer remained polite and calm, and he answered all of her questions without raising his voice.

The DUI officer placed the Appellee under arrest for DUI and handcuffed her. When the DUI officer initially started reading the implied consent notice, the Appellee interrupted him and requested to stand on the other side of the patrol car, away from traffic. After the Appellee moved to the opposite side of the patrol car, the DUI officer started over and read the implied consent notice. After the Appellee asked the DUI officer whether Georgia's laws had changed, the DUI officer again

5

read the implied consent notice. When he was finished, the DUI officer asked the Appellee if she agreed to undergo a breath test, and she responded, "Yes, I submit."

As the DUI officer gathered the Appellee's requested personal belongings and placed her into his patrol car, the Appellee asked him several questions, such as if she could make a phone call, if he could take her handcuffs off, and what she should tell her boyfriend. The DUI officer responded that his department's "policy doesn't allow phone calls until after the transport process is over[.]" She then asked "[w]hat would I do to eliminate this situation?" to which the DUI officer responded: "This situation is already undergoing. There is no more elimination at this point, alright?"

An audio recording from inside the DUI officer's patrol car shows that, on the way to the Cobb County police station, the Appellee asked several more questions, including whether the handcuffs could be adjusted to make them more comfortable, where the DUI officer was driving her, what her possible bond would be, what was the procedure for bonding out of jail, whether she would have to spend the night in jail, and what was the status of the other people involved in the accident. When the Appellee's phone rang again, the DUI officer apologized to the Appellee and told her that his department's policies did not allow her to answer her phone. After the Appellee expressed concern about her daughter, who was "14, by herself at [the

Appellee's] home," the DUI officer offered to send another officer to check on the girl. The DUI officer also told the Appellee that, even though it was against the police department's policy, he "love[d] children more than anybody. Once we get to the precinct, once we finish there, at the precinct, I'll let you call [your boyfriend] to make sure [your daughter] gets checked on." The Appellee asked what law enforcement officers would say to her daughter if they went to her home, and the officer stated that he would "try to have [the Appellee's] boyfriend" talk to her daughter. The Appellee expressed appreciation to the DUI officer for his assurances.

While still en route to the police station, the Appellee again asked if she could call someone about her daughter, and the DUI officer responded that he could not let her do that because he was driving and she was in handcuffs. He told her, however, that he was going to let her make a call "in a minute." After arriving at the police station, the DUI officer administered the breath test.[7]

The Appellee filed a motion in limine to exclude the results of her field sobriety and breath tests. After a hearing, the trial court found probable cause for the Appellee's arrest, but granted the Appellee's motion to suppress her HGN test results,

---

[7] The record does not contain documentation of the Appellee's breath test results.

and granted the Appellee's motion in limine to suppress the results of her breath test, ruling that she had been compelled to perform the breath test, so the admission of the test results at trial would violate her right against self-incrimination under the Georgia Constitution. The State filed a timely appeal from the order, challenging the suppression of the breath test results.[8]

> [On appeal, the] trial court's findings as to disputed facts in a ruling on a motion to suppress will be reviewed to determine whether the ruling was clearly erroneous; where the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review.[9]

As noted above, however, an appellate court may also "consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape."[10]

---

[8] The trial court's rulings regarding the HGN test results and the finding of probable cause for the Appellee's arrest are not at issue in this appeal.

[9] *State v. Gauthier*, 326 Ga. App. 473, 473-474 (756 SE2d 705) (2014) (citation, footnote and punctuation omitted).

[10] *Caffee*, 303 at 559 (1) (citations and punctuation omitted).

In Georgia, "[a] person shall not drive or be in actual physical control of any moving vehicle while . . . [t]he person's alcohol concentration is 0.08 grams or more at any time within three hours after such driving or being in actual physical control from alcohol consumed before such driving or being in actual physical control ended[.]"[11]

Further,

> any person who operates a motor vehicle upon the highways or elsewhere throughout this state shall be deemed to have given consent, subject to [OCGA § 40-6-392], to a chemical test or tests of his or her blood, breath, urine, or other bodily substances for the purpose of determining the presence of alcohol or any other drug, if arrested for any offense arising out of acts alleged to have been committed in violation of [OCGA § 40-6-391] or if such person is involved in any traffic accident resulting in serious injuries or fatalities.[12]

With these guiding principles in mind, we turn now to the State's specific claims of error.

The State argues that the trial court erred in ruling that the Appellee had been compelled to perform the breath test, so that administration of the test results violated

---

[11] OCGA § 40-6-391 (a) (5).

[12] OCGA § 40-5-55 (a).

the Appellee's right against self-incrimination provided by the Georgia Constitution. Specifically, the State argues that it did not compel the Appellee to submit to the breath test. We agree.

Under the Georgia Constitution, "[n]o person shall be compelled to give testimony tending in any manner to be self-incriminating."[13] In *Olevik v. State*,[14] the Supreme Court of Georgia ruled that a compelled breath test falls under the Georgia Constitutional right against self-incrimination, which protects individuals from having the results of a compelled breath test, or their refusal to submit to such testing, admitted against them in any criminal proceeding.[15] In *Olevik*, the Supreme Court held that the implied consent notice itself is still constitutional because the language

---

[13] Ga. Const. of 1983, Art. I, Sec. I, Par. XVI; see also OCGA § 24-5-506 (a) ("No person who is charged in any criminal proceeding with the commission of any criminal offense shall be compellable to give evidence for or against himself or herself.").

[14] 302 Ga. 228 (806 SE2d 505) (2017).

[15] Id. at 246 (2) (c) (iv) (The Supreme Court of Georgia overruled *Klink v. State*, 272 Ga. 605 (533 SE2d 92) (2000), and its progeny to the extent the cases stand for the proposition that "Paragraph XVI of the Georgia Constitution does not protect against compelled breath tests or that the right to refuse to submit to such testing is not a constitutional right.") (footnote omitted).

of the notice is not *per se* coercive.[16] Moreover, the Supreme Court of Georgia reaffirmed that the right against self-incrimination is not violated where an accused voluntarily consents to the act.[17]

> [W]hether a defendant is compelled to provide self-incriminating evidence in violation of [the Georgia Constitution] is determined under the totality of the circumstances. Determining the voluntariness of (or lack of compulsion surrounding) a defendant's incriminating statement or act involves considerations similar to those employed in determining whether a defendant voluntarily consented to a search. [The Supreme Court has] said that the voluntariness of a consent to search is determined by such factors as the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the psychological impact of all these factors on the accused. In determining voluntariness, no single factor is controlling.[18]

---

[16] *Olevik*, 302 Ga. at 247-248 (3) (a), 252 (3) (b).

[17] Id. at 242-243 (2) (c) (iii).

[18] Id. at 251 (3) (b) (citations and punctuation omitted). See, e.g., *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016) ("A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent.") (citation and punctuation omitted).

11

In its order on the Appellee's motion in limine to suppress, the trial court found that the Appellee "was compelled to [perform to the state-administered breath test], and to do that act two times, to produce evidence against herself in violation of her Georgia Constitutional right against self-incrimination." However, after reviewing the dashcam recordings of the police officer and the DUI officer, we find that the trial court erred in concluding that the Appellee had been compelled to provide self-incriminating evidence, because that conclusion was based upon the following clearly erroneous factual findings.

The audio and video recordings of the entire interaction between the Appellee and the DUI officer show that the Appellee asked the DUI officer numerous questions, and the officer answered her questions. The DUI officer did not make any promises or threats in order to obtain the Appellee's consent to submit to the state-administered breath test, nor did he conduct any interrogation of the Appellee after she was placed under arrest. And, although the DUI officer did not allow the Appellee to make any phone calls until they were finished with the breath tests, there is no

12

evidence that the Appellee was forced to take the breath tests against her will in order to make the phone calls, as the trial court appears to imply.[19]

Rather, the DUI officer's dashcam recordings show, that while the DUI officer was escorting the Appellee to his patrol car in order to conduct the field sobriety tests, the Appellee's phone rang and she stopped walking to search for it in her purse. Once she found her phone, she handed her purse to the DUI officer while she answered her phone. Then, when she was finished with the call, the Appellee handed the phone to the DUI officer, who put the phone in the Appellee's purse before putting the purse on the hood of his patrol car while he performed the field sobriety tests. Thus, the evidence does not support the trial court's finding that the Appellee consented to the breath tests after the Appellee's phone was "taken away from her" and "confiscated."

The trial court also found that, "[t]hroughout her encounter with [the DUI officer, the Appellee] indicated [that] she wanted to make phone calls before she made decisions, including whether to take the field sobriety tests and the [state-administered breath test at issued in this case]. Mixed in with requests to call a lawyer were requests to call someone to pick up her daughter from soccer practice."

_____

[19] The trial court, in its order stated that after the DUI officer told the Appellee that once she took the breath test she could make a phone call, the Appellee "finally agreed to take the breath test[.]"

13

According to the trial court, the DUI officer "refused to let [the Appellee] call anyone, but told her that *after she took his test* he would let her get someone to pick up her daughter. She was not given the option of making that telephone call *without taking the test*."[20] However, the DUI officer's dashcam recording does not support these findings. Instead, it shows that, while the Appellee was deciding whether to complete the field sobriety tests, she asked the DUI officer if she could call "somebody and ask someone to come get [her]."

Similarly, the trial court found that the DUI officer told the Appellee "that he was also concerned about her daughter and that, even though it was not the usual practice and procedure, *once she took his breath test* he would allow her to make a telephone call."[21] According to the trial court, right after that exchange, the Appellee "finally agreed to take the breath test[.]" The DUI officer's dashcam recording clearly shows, however, that the exchange at issue occurred while the DUI officer was transporting the Appellee to the police station, several minutes *after* she had consented to taking the breath test. Moreover, the DUI officer did not tell her that he would let her make a phone call "once she took [the] breath test," but, instead, told

[20] (Emphasis supplied.)

[21] (Emphasis supplied.)

14

her that she could call her boyfriend "once we finish there[ ] at the precinct." And, significantly, there is no evidence that, once she agreed to take the breath test, the Appellee *ever withdrew her consent* before taking the test.

In other words, the Appellee was not going to be allowed to make the calls until she *either* took the breath tests *or* refused to do so. Thus, refusing to allow her to make the calls did not constitute coercion.[22] Based on the foregoing, there is no evidence to support the trial court's finding that the Appellee's consent to the breath test was obtained *after* the DUI officer told her she could not call about her daughter unless she took the breath test, so that finding is clearly erroneous.[23]

Consequently, having applied the standard of review set forth in *Caffee v. State*,[24] and given the totality of the circumstances presented in this case,[25] we find that the indisputable evidence shown by the officers' dashcam recordings do not show that the State coerced or compelled the Appellee to undergo the breath test. It necessarily follows that, because the Appellee voluntarily consented to the breath test,

---

[22] See id. at 248 (3) (a).

[23] Id.

[24] See *Caffee*, 303 Ga. at 557, 559 (1).

[25] See *Olevik*, 302 Ga. at 248 (3) (a).

15

her constitutional right against self-incrimination would not be violated by the admission of the results of her breath test,[26] and the trial court erred in granting the Appellee's motion in limine to suppress those results.

Given this holding, the State's remaining argument is moot.

*Judgment reversed. Miller, P. J., and Doyle, P. J., concur.*

---

[26] See id.