**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia


Decided: January 17, 2023


S23A1159.  WILLIAMS v. THE STATE.


PETERSON, Presiding Justice.

Eric Williams appeals his convictions and sentence for malice murder and other offenses, stemming from the shooting death of Sean Brooks and non-fatal shooting of Michael Waters outside of a Chatham County nightclub in 2017.[1] Williams argues that the trial

---

[1] The crimes occurred in the early morning of October 8, 2017. On December 20, 2017, a Chatham County grand jury indicted Williams for malice murder (Count 1), two counts of felony murder predicated on aggravated assault (Count 2) and possession of a firearm by a convicted felon (Count 3), two counts of aggravated assault (Count 4 for the aggravated assault of Brooks, and Count 9 for the aggravated assault of Waters), four counts of possession of a firearm during the commission of a crime (Counts 5, 6, 7, and 10), and one count of possession of firearm by a convicted felon during the commission of a crime (Count 11).  The indictment also charged Williams as a recidivist (Count 12). The indictment included no Count 8. At a May 2019 trial, the jury found Williams guilty on all counts (except the recidivist count, which was not submitted to the jury). On May 24, 2019, the trial court imposed a sentence of "[l]ife imprisonment pursuant to OCGA [§] 17-10-7 (a)" for malice murder, four consecutive 10-year sentences for possession of a firearm during the commission of a crime, 20 years concurrent for the aggravated assault of Waters, and 15 years consecutive for possession of a firearm by a convicted

court erred by (1) denying Williams's motion to suppress evidence extracted from his cell phone; (2) admitting a YouTube video offered as a demonstrative aid; (3) admitting evidence of Williams's refusal to submit to a gunshot residue test; and (4) resentencing Williams sua sponte under the recidivist provision of OCGA § 17-10-7 (b) (2). Williams also raises several claims of ineffective assistance of counsel. We conclude that Williams has not shown that the trial court plainly erred in admitting evidence of his refusal to submit to a gunshot residue test, that any errors in admitting the YouTube video or denying the motion to suppress were harmless, and that the

_____

felon during the commission of a crime. The other counts merged or were vacated by operation of law. On May 28, 2019, Williams filed a motion for new trial, which was amended by appellate counsel on October 30, 2019. In an order entered on May 10, 2023, the trial court denied Williams's motion for new trial, except to the extent that the trial court stated that it agreed with Williams that Counts 5, 6, and 7 (three of the four possession of a firearm during the commission of a crime counts) should merge into the possession of a firearm by a convicted felon during the commission of a crime count (Count 11), such that the only firearms counts on which Williams would stand sentenced were Count 10 (possession of a firearm during the commission of a crime, based on the aggravated assault of Waters) and Count 11 (possession of a firearm by a convicted felon during the commission of a crime, based on the aggravated assault of Brooks). The order also stated that "Count 1 should read Life Imprisonment pursuant to OCGA § 17-10-7 (b) (2)." The following day, an amended final disposition form was filed reflecting these changes. Williams filed a timely notice of appeal. The case was docketed to this Court's August 2023 term and submitted for consideration on the briefs.

2

trial court did not err to the extent that it resentenced Williams pursuant to OCGA § 17-10-7 (b) (2). And, with respect to each claim of ineffective assistance of counsel, we conclude that trial counsel either did not perform deficiently in the way claimed or that any claimed deficiency did not prejudice Williams's defense, even when considered collectively with the other deficiencies of counsel and trial court errors that we presume. We therefore affirm.

The evidence presented at trial may be summarized as follows.[2] In October 2017, the defendant, Williams, was dating and living with Charietta Williams ("Charietta"). Charietta had previously dated the victim, Brooks, and the two had a son known as "Baby Sean." Charietta and Brooks frequently argued about the care of Baby Sean. Williams had negative feelings toward Brooks and had made threats against him, telling Charietta that he wanted to murder Brooks because of the way he disrespected her. Early in the

---

[2] Because Williams does not challenge the sufficiency of the evidence as to his convictions, and because we evaluate several claims of error and ineffective assistance in the light of the overall strength of the State's case, we do not present this in the light most favorable to the verdicts.

3

morning of October 8, 2017, Brooks was fatally shot outside a Chatham County nightclub. Police responded around 2:50 a.m. based on a 911 call and an automatic notification system that detects the sound of a gunshot in a given area.

Another patron of the bar, Waters, was shot in the leg during the shooting; he survived. Waters reported that just prior to the shooting, he observed the shooter and another man arguing with Brooks. Brooks told Waters that the dispute was over "some kind of female problem" or, more specifically, a "baby momma."

Christian Kelly testified that she drove Williams and Williams's father to the club that night. **V7-117-118, 121-123, 129»** She reported seeing Williams with a black gun in a holster on his hip prior to the shooting. Immediately after the shooting, Williams and his father ran to Kelly's car, and Kelly drove them away from the scene. In the car, Kelly heard Williams say to his father, "Dad, I think I shot him."[3] Kelly dropped off Williams's father and drove

---

[3] A detective testified that Kelly said in a prior interview that Williams said, "I *don't* think I shot him."

Williams to the hotel where Charietta was working. Charietta reported seeing a gun on Williams's hip when he arrived at the hotel. According to Charietta, while Williams and Charietta were driving from the hotel to her home, Williams informed Charietta that he shot Brooks.

Iesha Reed, a bystander who knew neither Williams nor Brooks, testified that she heard men outside the club arguing about "something pertaining to a child" before she heard gunshots. She identified Williams as the shooter in a photographic lineup.

1.  Williams argues that the trial court erred by denying his motion to suppress evidence seized from his cell phone. Assuming without deciding that the admission of this evidence was error, we conclude that any error was harmless.

As established at a pre-trial hearing, Detective Jason Manley proceeded to Charietta's home on the day of the shooting. Detective Manley testified at the hearing that, by this point, Kelly already had implicated Williams in the shooting and indicated that she believed Williams would be found with Charietta. The detective testified that

he encountered Williams at the house and noticed that "as soon as our eyes made contact, [Williams] immediately started manipulating" his cell phone. Williams and Charietta agreed to go to police headquarters for interviews. The detective "seized [Williams's cell phone] from his person" before they left Charietta's home. After placing Williams under arrest following the interview, police obtained a search warrant for the phone. The affidavit offered in support of the warrant application detailed information that implicated Williams in the shooting and made statements about the importance of cell phones in criminal investigations, but the affidavit did not mention any observation about Williams "manipulating" the cell phone or offer any particular statements about Williams's cell phone's connection to the crime. The warrant itself was rather sparse, stating by way of limitation only that "[t]here is now located [on Williams's phone] certain instruments, articles, persons, or things, namely: Information and data which are being possessed in violation of Georgia Law(s): . . . 16-5-1 Murder[.]"

Later, police obtained a passcode for the phone from Charietta.

Williams filed a motion to suppress evidence gathered from the search of his phone, arguing that police illegally seized the phone without a search warrant or probable cause, and illegally searched his phone when they "without [a] warrant or probable cause deputized [Charietta] as [an] agent of the State to open his cell phone[.]"A more particularized motion to suppress filed later specifically sought suppression of a particular photograph obtained from the phone, raising similar complaints. Defense counsel did not raise additional grounds for suppression in a hearing on the motion. The trial court denied the motion to suppress the photograph in a written order, stating: "The Court disagrees with Defendant's premise, finding the police had a valid search warrant for the contents of the cell phone. Further, the password was obtained from an independent source voluntarily." The information extracted from the cell phone was admitted at trial.

Citing cases largely decided under the Fourth Amendment, Williams argues that the evidence should have been suppressed because the cell phone was seized from his hands without probable

7

cause and was searched based on an overly broad search warrant that was not supported by probable cause. Although Williams did preserve his claim of error as to the *seizure* of the cell phone, it does not appear that Williams raised below all of his arguments about the *search* of the phone.[4] And the parties' arguments (which are not well developed in the record below or well briefed by the parties) raise complex issues about cell phone seizures and searches, such as the extent to which a warrant application must connect a phone to be searched to the underlying crime, and the sort of particularity needed in a warrant for a cell phone search. See, e.g., *State v. Wilson*, 315 Ga. 613, 628 (884 SE2d 298) (2023) (Pinson, J., concurring) ("[I]f this generic 'criminals use cell phones, too' logic is enough for

---

[4] Although the language in Williams's motion to suppress is confusing in its contention that police "without [a] warrant or probable cause deputized [Charietta] as [an] agent of the State to open his cell phone[,]" he appears to acknowledge on appeal that he did not raise below an argument that the search warrant lacked probable cause, stating in his appellate brief in support of his claim of ineffective assistance of counsel that "[t]rial counsel failed to particularize in the motion to suppress the absence of probable cause to conduct a download of the cell phone." He also states on appeal in support of his ineffectiveness claim that "counsel failed to particularize in the motion to suppress the failure to limit the scope of the download of the contents of the cell phone."

8

probable cause to get a warrant to search a suspect's cell phone — it is hard to imagine a case in which police cannot get that warrant.").[5] But we need not resolve these difficult questions. Even assuming that Williams preserved all of his arguments about the seizure and search of his cell phone, the strength of the State's case against Williams and the limited value of the evidence extracted from the cell phone render any error harmless.

"[A]n error of constitutional magnitude may be deemed harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict[.]" *Johnson v. State*, 310 Ga. 685, 696 (4) (c) (853 SE2d 635) (2021) (citation and punctuation omitted). The State's case against Williams was strong. The jury heard evidence that Williams had negative feelings toward Brooks, threatened Brooks, and told Charietta that he wanted to kill Brooks

---

[5] Among other things, the warrant's statement that the phone contained information and data "being possessed in violation of" the murder statute makes little sense. OCGA § 16-5-1 does not prohibit the possession of information and data. See *Wilson*, 315 Ga. at 620 n.6 (Peterson, P.J., concurring, joined by Boggs, C.J., and Warren, Bethel, Colvin, and Pinson, JJ) ("What it means to possess an item in violation of the law prohibiting murder is wholly unclear to me; that statute does not prohibit the possession of anything. Once again, it matters what actual language a warrant uses.").

because he perceived Brooks as disrespecting her.[6] Consistent with the notion that the shooting stemmed from a dispute between Williams and Brooks over the mother of Brooks's child, the surviving victim (Waters) and a disinterested eyewitness (Reed) reported that the shooter and the victim had some sort of argument over a "female," a "baby momma" or "a child." Reed also identified Williams as the shooter. Kelly testified that she dropped Williams off at the club that night, saw he had a gun, and drove him away from the scene after the shooting. Both Kelly and Charietta reported that Williams confessed to the shooting in their presence.

Given this strong evidence that Williams shot Brooks, the value of the evidence extracted from Williams's cell phone was minimal. Among the evidence extracted from the phone, Williams on appeal specifically cites a photograph of himself with a firearm and a "closeup" of the weapon; a text message from Williams to his father at 1:33 a.m. on the morning of the shooting that read, "Um

---

[6] Although some of these threats were contained in text messages, those messages were contained in an extraction from *Charietta*'s cell phone, the admission of which Williams has not challenged.

10

parked on the Side of the club . . . UM WIT YA . . . 312"; and another text message at 6:32 a.m. that morning from Williams's father that read, "One dead . . . one shot n da leg." Although the State attempted to link the photograph of Williams carrying a gun taken from his phone to the gun that Kelly and Charietta described Williams as carrying, the description given — a black gun in a holster — was rather general, and thus the photograph did not definitively link Williams to the shooting even if that testimony were credited by the jury. And the photograph extracted from Williams's phone showing him carrying a gun on his person is somewhat cumulative of an admitted photograph taken from Charietta's phone that also appeared to show him carrying a gun in a holster, minimizing the prejudicial impact of the photograph taken from Williams's phone. See *Scott v. State*, __ Ga. __, __ (2) (__ SE2d __) (Case No. S23A0861, decided Dec. 19, 2023) (concluding that assumed constitutional error was harmless where evidence in question was cumulative of other, properly admitted evidence).

As for the other evidence extracted from the phone that

11

Williams cites, the text message from Williams to his father indicating that he was at a club on the night of the shooting had little marginal benefit to the prosecution given the other eyewitness evidence placing Williams at the club and Williams's statements that he shot Brooks. And the later text in which Williams's father appeared to report the extent of injuries suffered by victims of the shootings was of little probative value.

In short, "[Williams's] claim fails because, even if he could show that the trial court erred in this regard, any such error was harmless beyond a reasonable doubt." *Johnson*, 310 Ga. at 696 (4) (c). The evidence that Williams now argues was erroneously admitted after being extracted from his phone was of minimal value to the prosecution in the light of the other, strong evidence against him. "We thus see no reasonable possibility that this evidence may have contributed to the verdict," and Williams's contention therefore fails. Id. at 696-697 (4) (c) (citation and punctuation omitted); see also *Young v. State*, 309 Ga. 529, 537-538 (3) (847 SE2d 347) (2020) (any error in admitting photograph depicting defendant with a gun was

12

harmless, because the value of the photograph was marginal in the light of the other evidence of guilt, and the photograph was cumulative of other properly admitted evidence); *Ensslin v. State*, 308 Ga. 462, 471 (2) (d) (841 SE2d 676) (2020) ("Even an error of constitutional magnitude . . . may be deemed harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." (citation and punctuation omitted)).

2. Williams argues that the trial court erred by admitting a video as a demonstrative aid purportedly to illustrate the concept of "selective attention." Assuming without deciding that the trial court erred in that regard, we conclude that any such error was harmless.

Shortly before the trial testimony of Detective Manley, the State informed the court that it intended to introduce a short video — the detective would testify that the video was "pulled from the Internet" — involving cups and a piece of chocolate, purportedly to

13

help the detective explain the concept of "selective attention," which the prosecutor described as "the inability of the human brain to effectively multitask when there's lots of competing stimuli." The prosecutor suggested that the video was relevant given the apparent defense strategy of highlighting discrepancies between what witnesses said Williams was wearing on the night of the shooting and what Waters reported the shooter was wearing. The defense objected to the admission of the video on the basis that the detective was not an expert in psychology and the video "encroaches on the domain of the jury." The trial court overruled the objection, with the caveat that the video would not go out with the jury, referring to it as a "demonstrative aid." The trial court gave a cautionary instruction to the jury that the exhibit "is being exhibited to you to what extent it may or may not help you to understand the testimony of this particular witness and, therefore, you are entitled to give it whatever weight you wish to give it, if you give it any weight at all." The record makes clear that the recording did not go out with the jury.

14

The nature of Williams's argument challenging the admission of this evidence on appeal is not entirely clear. He complains that "[t]he State did not tender [Detective] Manley as an expert to authenticate the experiment[,]" saying that authentication "requires more than establishing a demonstration was found on YouTube." He argues that "[t]he demonstration in question did not have substantial and reasonable similarity to the facts at issue in the case at bar." He also references the standard found in OCGA § 24-4-403, without explaining how that standard called for exclusion of the video.[7]

But even assuming error in admission of the demonstrative aid, it was harmless. See *Morrell v. State*, 313 Ga. 247, 261 (2) (c) (869 SE2d 447) (2022) ("It is fundamental that harm as well as error

---

[7] Indeed, "[d]emonstrative evidence implicates several provisions of the . . . Evidence Code." *Smith v. State*, 299 Ga. 424, 434 (3) (b) (788 SE2d 433) (2016). It of course must be relevant, and it may be excluded under OCGA § 24-4-403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See id. at 434-435 (3) (b). Laying a proper foundation for demonstrative evidence often means establishing a substantial similarity between the demonstration and the actual event at issue. See id. at 435 (3) (b).

must be shown for reversal."). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (citation and punctuation omitted). Given the lack of similarity between the events at issue in this case and what was depicted on the video — which involved merely cups and chocolate — there was little danger that the jury would consider the video to be some sort of reenactment of the events in question. And given that all the video appears to convey is the unremarkable proposition that an observer may sometimes miss something in the face of multiple simultaneous events or stimuli, it is highly probable that the video did not contribute to the verdict. This is especially true given the strength of the evidence, as detailed above. Therefore, any error in its admission is not a basis for reversal. See *Jivens v. State*, __ Ga. __, __ (2) (__ SE2d __) 2023 WL 8721065, at *5 (No. S23A1078, decided Dec. 19, 2023) (any error in admission of demonstrative photographs of model firearms was harmless given the compelling evidence of guilt and the limited prejudicial effect from the photographs);

16

*Williams v. State*, 302 Ga. 147, 155 (4) (805 SE2d 873) (2017) (any error in allowing State to engage in a demonstration regarding the crime was harmless, as any effect that the demonstration may have had on the jury "would have been minimal compared to the effect of the properly-admitted evidence before it").

3.     Williams argues that the State violated his Georgia constitutional right against compelled self-incrimination, see Ga. Const. 1983, Art. I, Sec. I, Par. XVI ("Paragraph XVI"), by eliciting testimony of his refusal to submit to having his hands swabbed for purposes of gunshot residue (GSR) testing. We conclude that the trial court did not plainly err in admitting this testimony.

With no defense objection, the State elicited Detective Manley's testimony that, during his October 8, 2017, interview of Williams, Williams refused to submit to GSR testing.[8] At the end of his initial closing argument, the prosecutor referenced this evidence of Williams's refusal.

---

[8] A recording of the interview of Williams was admitted at a pre-trial motion hearing. But it was not introduced at trial.

17

Because Williams did not object to the admission of evidence of his refusal to submit to GSR testing, the admission of the evidence is reviewed only for plain error, which requires, among other things, a showing of an error that is clear or obvious. See *State v. Herrera-Bustamante*, 304 Ga. 259, 263-264 (2) (b) (818 SE2d 552) (2018). "An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point." Id. at 264 (2) (b) (citation and punctuation omitted). "[A]n error is not plain under current law if a defendant's theory requires the extension of precedent." Id. (citation and punctuation omitted). Because Williams cannot show that admission of evidence of his refusal was an error that was clear and not open to reasonable dispute, he cannot show plain error.

Williams acknowledges that our precedent holds that admission of expert testimony about the results of GSR testing of a defendant does not violate Paragraph XVI. See *Tuff v. State*, 278 Ga. 91, 94 (3) (597 SE2d 328) (2004); *Strickland v. State*, 247 Ga. 219, 225 (18) (275 SE2d 29) (1981). The question of whether evidence of

18

his *refusal* to submit to such testing may be admitted consistent with Paragraph XVI raises a different, albeit related, question. In support of his argument that such evidence was inadmissible, Williams points to our decision in *Elliott v. State*, 305 Ga. 179 (824 SE2d 265) (2019), wherein we held that Paragraph XVI barred the State from using a defendant's refusal to submit to a chemical breath test against the defendant in her criminal trial. Id. at 179-180. But that holding was based on the conclusion in *Elliott*'s precursor, *Olevik v. State*, 302 Ga. 228 (806 SE2d 505) (2017), that submission to such a chemical breath test was an affirmative act to which Paragraph XVI applied given the deep lung breath and sustained strong blowing necessary for such a breath test, which requires a certain level of cooperation. See *Elliott*, 305 Ga. at 189-190 (III); *Olevik*, 302 Ga. at 243-244 (2) (c) (iii). Whether refusal to submit to swabbing of one's hands is similarly protected by Paragraph XVI presents a different question, and Williams points to no decision of ours that has decided it. Cf. *Olevik*, 302 Ga. at 243 (2) (c) (iii) (whether a test falls within Paragraph XVI's prohibition

on compelling a suspect to perform an incriminating act "depends on the details of the test"). Williams's argument thus would require an extension of, if not a departure from, existing case law. And that is fatal to Williams's argument under plain-error review. See *Herrera-Bustamante*, 304 Ga. at 266 (2) (b).

4. Williams argues that the trial court committed error by sua sponte resentencing him under the recidivist provision found in OCGA § 17-10-7 (b) (2). We disagree.

OCGA § 17-10-7 (a) provides that repeat felony offenders generally shall be given the sentence at the longest end of the statutory range, "provided that, unless otherwise provided by law, the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense." In contrast, OCGA § 17-10-7 (b) (2) provides that generally "any person who has been convicted of a serious violent felony in this state . . . and who after such first conviction subsequently commits and is convicted of a serious violent felony for which such person is not sentenced to death shall be sentenced to imprisonment for life without parole" without

an option for the sentence to be suspended, stayed, probated, deferred, or withheld. The recidivist count of the indictment of Williams, Count 12, merely cited OCGA § 17-10-7 generally, not a specific subsection, and charged Williams as a recidivist by citing March 2008 convictions for armed robbery and possession of a firearm during the commission of a felony.

The trial court initially imposed a sentence of life imprisonment for malice murder, four consecutive 10-year sentences for possession of a firearm during the commission of a crime, 20 years concurrent for the aggravated assault of Waters, and 15 years consecutive for the possession of a firearm by a convicted felon during the commission of a crime. The trial court, both at sentencing and in the final disposition form, specified that the life sentence was imposed pursuant to OCGA § 17-10-7 (a).

In Williams's motion for new trial, he asserted, among other things, a merger error with respect to the firearms offenses. In its May 10, 2023, order otherwise denying the motion for new trial, the trial court agreed with Williams's merger argument. The following

21

day, the trial court issued an amended final disposition form, merging all but one of the possession of a firearm during the commission of a crime counts into the possession of a firearm by a convicted felon during the commission of a crime count. he amended form specified that the sentence for malice murder was "[l]ife imprisonment pursuant to OCGA § 17-10-7 (b) (2)," although the form also had a box checked specifying that Williams was being sentenced as a recidivist under OCGA § 17-10-7 (a).

The parties apparently assume that the reference to OCGA § 17-10-7 (b) in the amended final disposition form means that the amended sentence for malice murder was one of life without parole. The State, via the Attorney General, argues that a sentence of life without parole was *required* under OCGA § 17-10-7 (b) based on Williams's prior armed robbery conviction.[9] Without addressing the State's argument that a life without parole sentence was required under OCGA § 17-10-7 (b) (2), Williams argues that the trial court

---

[9] The District Attorney's appellate brief states that "the trial court exercised its discretion in sentencing Appellant pursuant to O.C.G.A. § 17-10-7 (b)."

22

erred by sentencing him under that provision because that provision had not been "invoked" by the State such that he did not receive sufficient notice that such a sentence was possible. He also argues that he was "entitled to rely upon the finality" of the initial sentencing.

A sentence of life without parole was the sentence mandated by statute in this case. See OCGA § 17-10-7 (b) (2); see also OCGA § 17-10-6.1 (a) (2) (defining "serious violent felony" as including armed robbery). This Court has made clear that it does not violate double jeopardy "finality" principles to resentence a defendant in order to correct a void sentence. See *Parrott v. State*, 312 Ga. 580, 582-585 (3) (864 SE2d 80) (2021). And the State cannot deprive the trial court of the ability to correct a void sentence by inviting the initial error. See *Barber v. State*, 314 Ga. 759, 766 (3) n.6 (879 SE2d 428) (2022). Therefore, the trial court did not err to the extent that it imposed an amended sentence of life without parole pursuant to OCGA § 17-10-7 (b) (2).

To the extent that Williams complains of lack of notice, OCGA

§ 17-16-4 (a) (5) does provide that the State must, "no later than ten days prior to trial, or at such time as the court orders but in no event later than the beginning of the trial, provide the defendant with notice of any evidence in aggravation of punishment that the state intends to introduce in sentencing." But the indictment itself gave Williams notice of the evidence that the State intended to introduce in support of a life-without-parole sentence under OCGA § 17-10-7 (b) (2) — the prior armed robbery conviction. Therefore, Williams cannot say he did not receive the notice required by law.

5.  Finally, Williams argues that his trial counsel was ineffective in several respects. In particular, he argues that counsel was ineffective for (a) failing to properly allege applicable grounds in Williams's motion to suppress the evidence extracted from Williams's cell phone, (b) failing to object or ask for curative instructions when a prospective juror referred to Williams as an inmate during voir dire, (c) interjecting into the trial evidence of Williams's invocation of his right against self-incrimination, (d) failing to object to evidence of Williams's refusal to submit to GSR

24

testing, and (e) failing to request the redaction of the indictment to exclude certain references to a prior conviction. He also argues that he is entitled to a new trial due to the collective prejudicial effect of these alleged deficiencies in counsel's performance. We conclude that trial counsel either did not perform deficiently in the way claimed or that any claimed deficiency did not prejudice Williams's defense, even when considered collectively with the other deficiencies of counsel and trial court errors that we presume.

To succeed on his claim of ineffective assistance of counsel, Williams must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Williams's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "If [a defendant] fails to establish one of these two prongs, we need not examine the other." *Payne v. State*, 314 Ga. 322, 328 (3) (877 SE2d 202) (2022) (citation and punctuation omitted). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the

light of prevailing professional norms." Id. at 328-329 (3). "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 329 (3) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. (citation and punctuation omitted).

(a) Williams argues that trial counsel was ineffective by failing properly to allege applicable grounds in Williams's motion to suppress the evidence extracted from Williams's cell phone. In particular, he argues that counsel should have argued below that the extraction of data from the phone was not supported by probable cause and that there was a failure to limit the scope of the extraction. But we have concluded above, applying the higher standard applicable to consideration of harm from preserved constitutional error, that there is no reasonable probability that the evidence extracted from Williams's phone may have contributed to

26

the verdict. Williams therefore cannot show prejudice from any failure on counsel's part to allege grounds additional to the ones he in fact raised in the motion to suppress this evidence.

(b) Williams argues that trial counsel was ineffective by failing to object or ask for curative instructions when a prospective juror referred to Williams as an inmate during voir dire. We conclude that Williams cannot show that he was prejudiced by any deficient performance of counsel in this regard.

During voir dire at the May 2019 trial of the case, when the court's clerk asked the panel about impartiality, Juror No. 49 raised his hand and stated that he may have interacted with Williams in his role as a jail chaplain. During follow up questioning by the prosecutor, Juror No. 49 said he did not "recall specifically what [his] interaction was with this particular inmate[.]"Defense counsel did not seek a remedy for these comments. The juror was not selected for the petit jury.

Without deciding whether counsel performed deficiently in this regard, we conclude that Williams cannot show prejudice. Even

27

assuming that any juror who ultimately was empaneled mistakenly took Juror No. 49's remark to be evidence, "passing references to [a defendant's] incarceration [do] not place his character into evidence, particularly since a jury could reasonably assume that a defendant charged with murder would be arrested for the crime." *Miller v. State*, 295 Ga. 769, 776 (3) (a) (764 SE2d 135) (2014) (concluding that appellant failed to demonstrate that he was harmed by the trial court's failure to issue sua sponte curative instructions in response to witnesses' references to appellant's incarceration).

(c)  Williams argues that counsel was ineffective in that counsel interjected into the trial evidence of Williams's invocation of his right against self-incrimination, by eliciting testimony that Williams exercised his right to an attorney and by referencing this invocation in closing argument. We again conclude that Williams cannot show he was prejudiced by any failure of counsel in this regard.

During cross-examination of Detective Manley, defense counsel asked about the detective's interview of Williams, eliciting

28

testimony that Williams "freely talked" for some period of time but then invoked his right to counsel and "stopped the interview." In closing argument, defense counsel referenced Williams's invocation of his right to counsel during the interview.

Even assuming counsel performed deficiently in this regard, Williams has not shown that he was prejudiced as a result. Evidence that a defendant asks for an attorney and ends an interview is not necessarily prejudicial. See *Martin v. State*, 290 Ga. 901, 903 (1) (a) (725 SE2d 313) (2012) ("Martin's request for an attorney did not negatively point directly at the substance of Martin's claim of self-defense or otherwise substantially prejudice Martin."). Here, particularly given the strong evidence of Williams's guilt presented by the State, Williams has not shown that the result of his trial would have been different but for counsel's actions in this regard.

(d)   Williams argues that trial counsel was ineffective by failing to object to testimony that Williams refused to submit to GSR testing. We disagree. As discussed above, the suggested objection would have called for an extension of or a change in existing law.

29

Failure to make an objection that would call for an extension of or a change in the law is not deficient performance. See *Lowe v. State*, 314 Ga. 788, 796 (2) (b) (879 SE2d 492) (2022) ("[I]t is well settled that a criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (citation and punctuation omitted)); *Rhoden v. State*, 303 Ga. 482, 486 (2) (a) (813 SE2d 375) (2018) ("Counsel is not obligated to argue beyond existing precedent." (citation and punctuation omitted)).

(e) Williams argues that trial counsel was ineffective by failing to request the redaction of the indictment to exclude certain references to his prior conviction for possession of a firearm during the commission of a crime. Again, Williams cannot show how this failure changed the outcome of the trial.

The possession of a firearm during the commission of a crime counts, Counts 5, 6, 7, and 10, in addition to alleging that Williams possessed a firearm while committing various crimes against Brooks and Waters on October 8, 2017, alleged that on March 13, 2008,

30

Williams had been convicted of a violation of OCGA § 16-11-106. The felon-in-possession count, Count 11, alleged that Williams had been convicted of armed robbery on March 13, 2008, specifying that was "a felony involving the use of a firearm[.]" And the indictment included a separate count, Count 12, charging Williams as a recidivist, specifying that Williams had been convicted of armed robbery and possession of a firearm during the commission of a felony on March 13, 2008. Although the specifics are unclear, the transcript suggests that the indictment itself was redacted in some fashion before it was sent back with the jury; the trial court at one point indicated that the State had redacted the indictment "with respect to the recidivist count as well as taking out the offense itself in Count Three."[10]

Williams argues that trial counsel was deficient for failing to request redaction of the references in Counts 5, 6, 7 and 10 to

---

[10] Count 3 charged Williams with felony murder predicated on the commission of the offense of possession of a firearm by a convicted felon, but did not otherwise refer to any particular prior offense. The State represents that "[t]he record does not contain a copy of the redacted indictment that went out with the jury."

31

Williams's previous conviction for a violation of OCGA § 16-11-106. He argues that these references were germane only for sentencing purposes and did not allege additional elements for the State to prove to the jury at trial. But even assuming that these references were not in fact redacted from those counts in the indictment given to the jury, and even assuming that counsel performed deficiently in failing to request such a redaction, Williams has not shown he was prejudiced by any such failure. Even if trial counsel had successfully moved for the redaction of the references to the prior conviction in Counts 5, 6, 7, and 10, the jury still would have learned that Williams previously had been convicted of a felony involving the use of a firearm. The jury heard a stipulation to the effect that, in March 2008, Williams had been convicted of "a felony offense involving the use of a firearm" in violation of OCGA § 16-11-106. Williams does not argue that counsel's agreement to the stipulation amounted to deficient performance by counsel. Williams thus cannot show how the reference to his prior conviction under OCGA § 16-11-106 in Counts 5, 6, 7, and 10 changed the outcome of the trial.

(f) Williams finally argues that the cumulative prejudicial effect of trial counsel's failures deprived him of a fair trial. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020). We disagree. As discussed above, the marginal value of the evidence extracted from Williams's cell phone was minimal, comments about Williams's incarceration or invocation of his right to counsel were not very prejudicial, and Williams cannot show how he was harmed by any failure on counsel's part to seek redaction of the reference to a violation of OCGA § 16-11-106, given the unchallenged stipulation. Even considering collectively the deficiencies in counsel's performance that we have assumed, we conclude that Williams has not shown a reasonable probability of a different result in the absence of these assumed deficiencies, particularly given the strength of the other evidence of Williams's guilt.

In addition to assuming some deficient performance by trial counsel, we have assumed two trial court errors of an evidentiary

33

nature — admission of the extraction from Williams's phone and admission of the demonstrative video on selective attention — and determined that each error was harmless. Although Williams argues that we should consider the collective prejudice of alleged instances of deficient performance by trial counsel, and although he cites *Lane* and its progeny, Williams has made no argument that we should apply a cumulative error review that encompasses trial court errors. See *Lane*, 308 Ga. at 17 (1). Nevertheless, even assuming that we must sua sponte apply a cumulative error review under *Lane*, we conclude that Williams has failed to establish that the combined prejudicial effect of these assumed trial court errors and assumed deficient performance of trial counsel denied him a fundamentally fair trial. See, e.g., *Huff v. State*, 315 Ga. 558, 568 (6) (883 SE2d 773) (2023) (rejecting cumulative error claim "because Appellant ha[d] not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial, given the strong evidence against him[.]").

*Judgment affirmed. All the Justices concur.*

34